**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | **Case No. 3:23-md-3071** |
| **IN RE: REALPAGE, INC., RENTAL** | ) | **MDL No. 3071** |
| **SOFTWARE ANTITRUST** | ) | |
| **LITIGATION (NO. II)** | ) | **JURY DEMAND** |
| | ) | |
| | ) | **Chief Judge Waverly D. Crenshaw, Jr.** |
| | ) | |
| | ) | **This Document Relates to:** |
| | ) | **3:23-cv-00326** |
| | ) | **3:23-cv-00378** |
| | ) | **3:23-cv-00391** |
| | ) | **3:23-cv-00445** |
| | ) | **3:23-cv-00742** |
| | ) | **3:23-cv-00757** |
| | ) | **3:23-cv-00792** |
| | ) | **3:23-cv-00979** |

**PLAINTIFFS' OPPOSITION TO**
**THE THOMA BRAVO DEFENDANTS' MOTIONS TO DISMISS**
**MULTIFAMILY PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS**
**ACTION COMPLAINT AND STUDENT PLAINTIFFS'**
**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## I.    INTRODUCTION

In April 2021, Thoma Bravo bought RealPage, Inc., and remains its owner today. At the time of purchase, Thoma Bravo issued a press release in which Thoma Bravo's founder and managing partner, Orlando Bravo, predicted that the Thoma Bravo-RealPage relationship would be like a "partnership," with Thoma Bravo providing "the expertise and resources" to "accelerate RealPage's momentum as it innovates on behalf of its customers."[1] ¶ 65. RealPage's customers are the Defendants here, and the innovation Orlando Bravo was referring to is RealPage's Revenue Management Solutions ("RMS"), the cartel-facilitating algorithmic pricing tool at the center of this case.

Under Thoma Bravo's watch, RealPage, Inc.'s founder stepped down and was replaced by a CEO that had previously been CEO of a different Thoma Bravo subsidiary. In a YouTube interview in the fall of 2022, a Thoma Bravo partner identified RealPage, Inc. as the "clear market leader" in multifamily real estate software, and specifically identified RealPage's RMS, which he described as "a data analytics product that helps in decision making around pricing in rental units," as a key item in RealPage, Inc.'s software portfolio. ¶ 62. The price-fixing scheme that Plaintiffs allege has not stopped, nor slowed, since Thoma Bravo acquired RealPage, Inc.

Plaintiffs seek to hold Thoma Bravo—the entity that holds itself out to the public as the purchaser, owner, and operator of RealPage, Inc.—to account for their role in the alleged price-fixing cartel. Plaintiffs have named the principal Thoma Bravo entity, Defendant Thoma Bravo, L.P., and the two Thoma Bravo funds involved in the RealPage, Inc. purchase: Defendants Thoma

---

[1] Unless otherwise defined herein, all terms are used pursuant to their respective definitions in Plaintiffs' Second Amended Consolidated Class Action Complaint ("AC"), Dkt. 530, and all citations to "¶" or "¶¶" refer to the AC.

Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P. (collectively, "Thoma Bravo" or the "Thoma Bravo Defendants").[2]

In response, Thoma Bravo seeks to duck accountability by playing corporate shell games. Thoma Bravo held itself out to be the purchaser and owner of RealPage, Inc. including by issuing press releases quoting the named managing partner. However, through statements of outside counsel, the Thoma Bravo Defendants now claim that "RealPage is an indirect subsidiary of certain private investment funds, which are themselves held by limited partners."[3] TB MTD at 3-4. Thoma Bravo appears to suggest that Plaintiffs should have sued the two entities that were created solely for the purposes of the merger, which (according to the Motions) are "affiliates" of the Thoma Bravo Funds, "which are themselves affiliates of Thoma Bravo." TB MTD at 1 n.3.

Cutting through the corporate double-speak, the Thoma Bravo Defendants advance one pertinent argument[4] in favor of their dismissal: that Plaintiffs have not pled sufficient facts beyond

---

[2] As defined in the AC, Defendants Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P. are referred to herein collectively as the "Thoma Bravo Funds." ¶ 62.

[3] Thoma Bravo filed two substantively identical Motions to Dismiss, one directed at the AC ("TB MTD") and another at the Student AC. *See* Dkts. 571 and 573, respectively. For brevity, Plaintiffs file one *omnibus* opposition, and refer to all substantively identical arguments by their position in the TB MTD.

[4] The Thoma Bravo Defendants also argue that they could not have conspired with RealPage, Inc. as a matter of law because Thoma Bravo and RealPage, Inc. are a single economic entity under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), and that Plaintiffs do not allege that the Thoma Bravo Defendants directly interacted with the property owners and/or managing Defendants. *See* TB MTD at 5-9. It is possible, however, for a corporate parent (Thoma Bravo) and its wholly owned subsidiary (RealPage, Inc.) to both be held liable under the Sherman Act if one assists the other in a price-fixing cartel among horizontal competitors from different corporate families, as Plaintiffs have alleged here. ¶¶ 65-66. *See In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 446 (S.D.N.Y. 2015) (concluding, where the cartel was "a web of alleged agreements . . . between a number of entities from different corporate families," that "[n]otwithstanding [agency] affiliations," "[t]he 'web' of agreements . . . alleged [was] sufficient to satisfy [*Copperweld*'s] separate entity requirement"). Finally, to the extent that the Thoma Bravo Defendants purport to improperly adopt arguments from Defendants' Motion to Dismiss Multifamily Plaintiffs' First Amended Consolidated Class Action Complaint, Dkt. 341 ("Joint

2

Thoma Bravo's ownership of co-Defendant RealPage, Inc. for the Court to plausibly infer that Thoma Bravo participated in the cartel. *See* TB MTD at 9-12.

Thoma Bravo's argument ignores both, (1) Plaintiffs' well-pled facts concerning Thoma Bravo's involvement in the cartel; and (2) controlling caselaw governing this Court's application of Rule 12 to those facts. As to the former, Plaintiffs plead that Thoma Bravo made statements at the time of its 2021 purchase of RealPage, Inc. that it intended to be more than a passive owner or mere investment advisor. ¶ 65. Plaintiffs further allege that Thoma Bravo followed through and took active steps to advise and assist RealPage, Inc. in administering the anticompetitive scheme. ¶ 66. In support of this, Plaintiffs cite an interview with a Thoma Bravo partner who admits that Thoma Bravo took active steps to position RealPage, Inc. in the market. ¶¶ 65-66. In so doing, Thoma Bravo actively participated in RealPage's violation of state and federal antitrust laws.

As to the latter, Thoma Bravo ignores that courts recognize that economic reality, rather than corporate form, determines whether two related entities are viewed as separate or unified economic entities for antitrust purposes. To state a claim based on the anticompetitive conduct of a unified economic entity (which the Thoma Bravo Defendants concede they are, under *Copperweld*, *see* TB MTD at 6), Plaintiffs need not allege that each corporate entity within the single economic entity participated in each and every element of the alleged Sherman Act violations. Instead, if a plaintiff's allegations of anticompetitive conduct (read holistically) are well-pled as to a single economic entity, then each constituent piece of that entity that participated in the anticompetitive conduct can be included as a defendant. *See Aluminum Warehousing*, 95 F. Supp. 3d at 446; *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 885-86 (N.D. Ill. 2010)

---

MTD"), *see* TB MTD at 1 n.1, Plaintiffs address those arguments in their opposition to the Joint MTD.

(rejecting the "broad proposition" "that companies in an agency relationship cannot conspire to commit violations of § 1 of the Sherman Act," and stating that defendant's "role as [a] sales agent [for a principal] merely streamlined the process by which the two . . . companies [aided the principal's] co-conspirators"). That is what Plaintiffs plead here. Plaintiffs have adequately alleged that the Thoma Bravo Defendants, as a constituent piece of the RealPage single economic entity, actively participated in the anticompetitive conduct alleged.[5]

Plaintiffs' allegations therefore plausibly state a claim against the Thoma Bravo Defendants, and the Court should deny both of Thoma Bravo's Motions to Dismiss.

## II.    LEGAL STANDARD

In analyzing a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). *Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[6] In the Sixth Circuit, a complaint must simply "put defendants on notice concerning the basic nature of [plaintiff's] complaints against the defendants and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

---

[5] *See* AC at 2-3 (defining "Defendants RealPage, Inc., Thoma Bravo Fund XIII, L.P., Thoma Bravo Fund XIV, L.P., and Thoma Bravo L.P." as "(collectively, 'RealPage')").
[6] Unless otherwise noted, all internal citations and quotations are omitted, and emphasis is added.

### III.    ARGUMENT

The Thoma Bravo Defendants seek to duck accountability for their alleged strategic guidance of, and partnership with, RealPage as a single economic entity. They do so by asserting that Plaintiffs fail to allege that Thoma Bravo has "anything beyond indirect ownership" of RealPage, Inc. TB MTD at 2-3. But that assertion is not correct. Plaintiffs plead that Thoma Bravo controls RealPage, Inc., such that Thoma Bravo and RealPage, Inc. constitute a single economic unit for antitrust purposes under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), a conclusion Thoma Bravo admits, as it must. TB MTD at 6. Notwithstanding their corporate affiliation, both entities remain liable under Section 1 of the Sherman Act. *See Aluminum Warehousing*, 95 F. Supp. 3d at 446; *Sulfuric Acid*, 743 F. Supp. 2d at 885-86.

### A.    Single Enterprise Liability for Sherman Act Violations Under *Copperweld*, *Arandell,* and *Lenox MacLaren.*

In *Copperweld*, the Supreme Court held that a parent company and its wholly owned subsidiaries cannot conspire to violate the Sherman Act because "a parent company and wholly-owned subsidiary have already-converged goals and thus their actions 'must be viewed as that of a single enterprise' for purposes of § 1 of the Sherman Act." *Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 722 (W.D. Tenn. 2022) (quoting *Copperweld*).

The underlying premise of *Copperweld*—that corporate affiliates are to be viewed as a single economic entity for antitrust purposes—also applies when determining which entities that form part of a single economic entity can be held liable for Sherman Act violations. *See City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 274-75 (8th Cir. 1988) (observing that "the logic of *Copperweld* reaches beyond its bare result" and "economic reality,

5

not corporate form, should control the decision of whether related entities can conspire").[7] Courts applying *Copperweld* to assess liability of a corporate group have repeatedly rejected the "counterintuitive" conclusion that Thoma Bravo proposes the Court reach here: "that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind its separate" legal status. *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069 (D. Colo. 2004) ("*Nobody in Particular*"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) (holding *Copperweld* "forecloses" a result that would enable a "sophisticated competitor[]" to "spread its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability," allowing the single enterprise to violate the Sherman Act "with impunity"); *cf. Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 630-32 (9th Cir. 2018) ("*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part.").

Thus, when determining whether a conspiracy claim is adequately pled against a parent company whose subsidiary participates in the alleged cartel, a court should examine the conduct of the "economic unit" as a whole and assign liability to any participating or directing corporate entity. *See Aluminum Warehousing*, 95 F. Supp. 3d at 446; *Sulfuric Acid*, 743 F. Supp. 2d at 885-86. Accordingly, Plaintiffs may adequately state a claim against a single economic entity under

---

[7] The Sixth Circuit has not explicitly endorsed the single enterprise framework, however, nearly all courts that have addressed the application of the *Copperweld* principle have accepted parent liability for a subsidiary's anticompetitive conduct, including *Lenox MacLaren*, which Thoma Bravo cites. *See* TB MTD at 7. And while this Court has not addressed the question, the Western District of Tennessee has adopted this same approach. *Varsity Brands*, 618 F. Supp. 3d. at 722.

the Sherman Act based on that entity's "aggregate conduct," without having to allege each specific constituent piece of the enterprise "independently satisfied each necessary element of the claims." *Lenox MacLaren*, 847 F.3d at 1236.[8]

**B.      Plaintiffs Sufficiently Allege that Thoma Bravo Independently Participated in the Anticompetitive Conduct.**

As the final step to hold any given corporate entity "liable as part of the enterprise," Plaintiffs must allege that entity "independently participated in the enterprise's scheme." *Lenox MacLaren*, 847 F.3d at 1237; *Varsity Brands*, 618 F. Supp. 3d at 723 (same) (citing *Arandell*).

Plaintiffs are not aware of any court that has adopted a bright-line pleading test for "what must be shown in order to hold a particular affiliated corporation liable as part of an inter-corporate scheme." *Lenox MacLaren*, 847 F.3d at 1239 (leaving that question "for another day"). Despite this, courts have proposed certain limiting principles. To state a claim for antitrust liability against a parent, it is clear that a plaintiff must allege "more than mere ownership." *Varsity Brands*, 618 F. Supp. 3d at 723. At the same time, however, it is equally clear that the parent need not be an actual "seller, competitor, or participant" in the affected market. *Nobody in Particular*, 311 F. Supp. 2d at 1069.

Moreover, recognizing that the contours of specific affiliates' conduct within a corporate group are often unclear from the outside, courts have applied a low bar at the motion to dismiss stage, allowing efforts to determine the precise roles that each related corporate entity played in a cartel to continue through discovery. *See, e.g.*, *In re Lantus Direct Purchaser Antitrust Litig.*, 2021 WL 8016913, at *5 (D. Mass. June 11, 2021) (noting lack of consensus and leaving exact role each

---

[8] This theory of liability does not require allegations of "veil-piercing, alter ego, or respondeat superior," which "operate independently of the single-enterprise theory." *Lenox MacLaren*, 847 F.3d at 1237. Accordingly, Thoma Bravo's arguments pointing to the lack of those allegations in the AC, *see* TB MTD at 9-11, are irrelevant.

corporate entity played in furtherance of anticompetitive scheme to be "resolved following development of the evidence"); *cf. Varsity Brands*, 618 F. Supp. 3d at 725 and n.8 (observing that "[d]iscovery may elucidate further facts as to [parents'] direct participation in the scheme, which will be required at later litigation phases," but declining to parse "whether [corporate defendants] share liability as an enterprise for violations or can be held separately and individually liable for any individual anticompetitive conduct" because that inquiry was "not an issue to be determined at the motion to dismiss stage").

Plaintiffs have adequately alleged that Thoma Bravo was more than a passive owner of RealPage, Inc. First, Thoma Bravo purchased RealPage, Inc. in 2021 for over $10 billion, after which it had the ability to control RealPage, Inc.'s business as it saw fit. ¶ 61. Plaintiffs allege that Thoma Bravo provided "active guidance" and "control[led] the strategic operation" of RealPage, ¶ 62, and Plaintiffs are entitled to the reasonable inference that RealPage, Inc.'s continued participation in the anticompetitive scheme was done with Thoma Bravo's knowledge and blessing. *See In re Packaged Seafood Prod. Antitrust Litig.*, 2022 WL 836951, at *11 (S.D. Cal. Mar. 21, 2022) (plaintiff pled parent's participation in pre-existing cartel by alleging parent "ratified and encouraged" subsidiary's continued participation, including "by knowingly setting [subsidiary]'s financial goals at levels which were untenable in the absence of collusion").

Indeed, it is not plausible that Thoma Bravo was ignorant of RealPage, Inc.'s role in the cartel, either before or after the transaction. Thoma Bravo touts itself as a "leading private equity firm focused on the software and technology-enabled services sectors [w]ith more than $76 billion in assets under management."[9] Plaintiffs are entitled to the reasonable inference that a

---

[9] *See* Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/ (cited in AC, ¶ 61 n.62).

sophisticated boutique software investor like Thoma Bravo would have spent hundreds of hours performing due diligence before purchasing *a $10 billion company*. Plaintiffs are also entitled to the resulting inference that Thoma Bravo either knew or should have known that: (1) RealPage, Inc. had a monopoly position in the market after RealPage, Inc.'s acquisition of LRO (and indeed, RealPage, Inc.'s monopoly profits were likely a driving reason that Thoma Bravo purchased RealPage, Inc.); (2) RealPage, Inc. was using its RMS software to facilitate widespread rent-fixing even prior to the LRO acquisition; and (3) rents had exploded as a result of RealPage Inc.'s RMS. Even if a sophisticated boutique software investor like Thoma Bravo spent $10 billion to purchase RealPage, Inc. without doing proper due diligence, it is even less plausible to conclude that Thoma Bravo did not identify RealPage's role in the cartel during Thoma Bravo's multiple years of active ownership. Indeed, by its founder's own words, "[Thoma Bravo's] world is to do due diligence for two months, to get to know a company for 15 years, to get to know how the recurring revenue is doing, their net retention, gross retention, and really get to know management." ¶ 65.

Second, Plaintiffs point to documents contemporaneous to the acquisition in which both Thoma Bravo and RealPage, Inc. state their intent for Thoma Bravo to be actively involved in RealPage, Inc.'s operations post-acquisition. ¶ 65 (speaking of "partnership" and operating "together," with Thoma Bravo bringing "expertise and resources" to "help" and "accelerate" RealPage, Inc.'s growth).

Third, against that backdrop of a publicly professed intent to coordinate, Plaintiffs allege that Thoma Bravo is "actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage, [and] setting company policies." ¶ 66. Other courts have found allegations that a parent controls strategic operations and investment decisions of an operating entity within the same economic entity as a favorable fact in determining

whether plaintiffs sufficiently alleged the parent's participation in the anticompetitive scheme. *See Varsity Brands*, 618 F. Supp. 3d at 724 (allegations parent was "providing funding" for subsidiary to "enhance, extend, and ensure their monopoly power" and "acquire rivals" showed direct involvement) (cleaned up); *Sulfuric Acid*, 743 F. Supp. 2d at 886 (stating that defendant's "role as [a] sales agent [for a principal] merely streamlined the process by which the two . . . companies [aided the principal's] co-conspirators"); *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 706 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) ("Apple [the sales agent] was an essential member of the charged conspiracy and was fully complicit in the scheme to raise e-book prices even though the Publisher Defendants [principals] also had their own roles to play."); *Nobody in Particular*, 311 F. Supp. 2d at 1069 (independent participation by parent adequately pled where alleged it was "directing, controlling, and encouraging a wholly-owned subsidiary's anticompetitive conduct").

Plaintiffs also allege that Thoma Bravo was "actively involved in . . . hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems." ¶ 66.[10] These allegations favor finding that Thoma Bravo actively participated in the anticompetitive scheme. *See Varsity Brands*, 618 F. Supp. 3d at 724 (concluding that plaintiffs adequately pled parent

---

[10] Thoma Bravo draws the Court's attention to the timing of these appointments *vis-à-vis* Thoma Bravo losing majority ownership of Sparta, *see* TB MTD at 10 n.7, but Plaintiffs have alleged that Thoma Bravo "recruited" and "hired" RealPage, Inc.'s CEO and COO from another Thoma Bravo subsidiary. Whether Thoma Bravo exerted sufficient control over Sparta to force Sparta to give up those employees is beside the point—however, whether Thoma Bravo exerted sufficient control to force RealPage, Inc. to accept those employees is of significance. Moreover, Thoma Bravo is not entitled to introduce its own contradictory factual allegations to assert alternative explanations on a motion to dismiss. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (confirming "black-letter law" that a court evaluating a motion to dismiss "must focus only on the allegations in the pleadings").

company independently participated in the agreement by alleging it was "involved in [its subsidiary]'s leadership" during time period spanning anticompetitive conduct).

Fourth, Plaintiffs allege that Thoma Bravo controls RealPage, Inc. by, among other things, the fact that "Thoma Bravo Operating Partner Charles Goodman" acts as "Chairman of RealPage's board of directors." ¶ 66.[11] Similar allegations have also been credited in finding direct parent participation. *See Varsity Brands*, 618 F. Supp. 3d at 724 (finding plaintiffs plausibly pled parent company participation in single economic entities' infringement by alleging that its staff/executives were "sitting on [subsidiary]'s Board of Directors").

Fifth, while discovery will ultimately determine the precise level of Thoma Bravo's involvement with RealPage's day-to-day operations, additional facts pled in the AC reinforce the plausibility of Plaintiffs' allegations and the reasonable inferences to be drawn from those allegations. In the AC,[12] Plaintiffs describe a YouTube interview in which a Thoma Bravo partner, Mr. Scott Crabill, is interviewed for nearly an hour about Thoma Bravo's acquisition of RealPage, Inc. ¶¶ 63-66. While Mr. Crabill does not, unsurprisingly, describe RealPage, Inc. as the fulcrum of a price-fixing cartel during this public interview,[13] Mr. Crabill states that Thoma Bravo bought

---

[11] Whether and to what extent the employment status of Thoma Bravo Operating Partners is relevant to Thoma Bravo's control over them, *see* TB MTD at 11 n.8, is a fact issue unsuitable for determination at this stage, as is the manner in which Thoma Bravo exerts control over its "private investment funds" through the "investment advisory services" it provides. TB MTD at 3-5. This is particularly true here, as these Defendant-provided "facts" are again drawn from outside the four walls of the complaint. *Green Farms Condo,* 958 F.3d at 483.

[12] To the extent the Court finds the allegations in the AC sufficient as to Thoma Bravo, but the allegations in the Student AC insufficient (*i.e.*, the allegations contained in AC ¶¶ 63-66 are dispositive), Student Plaintiffs respectfully request the Court grant leave to amend to add the allegations in AC ¶¶ 63-66. However, for the reasons discussed above, Plaintiffs believe these additional allegations go far beyond what is required at the pleading stage and only reinforce the plausibility of reasonable inferences to which Plaintiffs are already entitled.

[13] *Cf.* TB MTD at 11 (arguing YouTube interview should not be credited because it does not "suggest any involvement in a price-fixing conspiracy").

RealPage, Inc. knowing that Thoma Bravo (1) would have to replace RealPage, Inc.'s management team (and did in fact replace RealPage, Inc.'s management team, including with the CEO of a prior Thoma Bravo subsidiary, post-acquisition), and (2) would need to identify and execute a number of follow-on, "tuck-in" transactions (which it then did in fact do). In sum, Mr. Crabill's public statements confirm that Thoma Bravo was just as involved in the day-to-day operations of RealPage, Inc. as both Thoma Bravo and RealPage, Inc. said they intended Thoma Bravo to be when the transaction was finalized.

These allegations, when viewed in the aggregate,[14] are sufficient to plausibly infer that the Thoma Bravo Defendants acted independently as part of a single-entity enterprise in furtherance of the anticompetitive scheme described in the AC. That is all that is required.

## IV.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Thoma Bravo's Motion to Dismiss.

---

[14] *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts must view Sherman Act claim in aggregate, without "dismembering it and viewing its separate parts"); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (same). Thoma Bravo's compartmentalized, alternative fact-laden explanations for each of Plaintiffs' allegations cannot be credited at the Rule 12 stage. Indeed, the case Thoma Bravo cites in support of these alternative explanations, *United States v. Bestfoods*, *see* TB MTD at 11-12, is an environmental cleanup case decided on principles that are not applicable in the antitrust context. *Cf.* 524 U.S. 51, 62 (1998) (reciting common law principle of respecting corporate separation, noting that "nothing in CERCLA purports to reject this bedrock principle"), *with Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (holding that individual employee and corporate employer are separate actors for purposes of RICO, which was not "inconsistent with antitrust law's intracorporate conspiracy doctrine; [as] that doctrine *turns on specific antitrust objectives*") (citing *Copperweld*). Thoma Bravo makes no effort to address Plaintiffs' allegations of their involvement in RealPage's anticompetitive conduct in the aggregate.

Dated:   November 8, 2023

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
Isabella DeLisi
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com
idelisi@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
Stephanie A. Chen

13

J. Austin Hurt
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com
gkozen@robinskaplan.com
schen@robinskaplan.com
ahurt@robinskaplan.com

Swathi Bojedla
Mandy Boltax
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
sbojedla@hausfeld.com
mboltax@hausfeld.com

Gary I. Smith, Jr.
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com

Katie R. Beran
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: 1 215 985 3270
kberan@hausfeld.com

*Interim Co-Lead Counsel*

14

Eric L. Cramer
Michaela L. Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net

Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Brendan P. Glackin
Dean M. Harvey
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Steve W. Berman
Breanna Van Engelen
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com

Christopher M. Burke
Walter W. Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA  92101
Telephone: (619) 625-5621
Facsimile (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

**JOSEPH SAVERI LAW FIRM, LLP**
Joseph R. Saveri
Steven N. Williams
Cadio Zirpoli
Kevin E. Rayhill
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Alexander Sweatman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603

15

Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Benjamin J. Widlanski
Javier A. Lopez
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
jal@kttlaw.com

Telephone:  312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
asweatman@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld
